**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

COYOTE VALLEY BAND OF POMO
INDIANS OF CALIFORNIA, *et al.*,

        Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

        Defendants.

Case No. 15-cv-04987-JSW

**ORDER DENYING PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT
AND GRANTING, IN PART, AND
DENYING, IN PART, FEDERAL
DEFENDANTS' CROSS-MOTIONS FOR
SUMMARY JUDGMENT**

Re: Dkt. Nos. 130, 139

        Now before the Court is the motion for summary judgment filed by Plaintiffs Coyote
Valley Band of Pomo Indians of California ("Coyote Valley") and The Round Valley Indian
Tribes of California ("Round Valley") (collectively "Plaintiffs").[1]  Also before the Court is the
cross-motion for summary judgment filed by the United States Department of Transportation
("USDOT"), Secretary of the USDOT, Elaine Chao, the Federal Highway Administration
("FHWA"), and Brandye Hendrickson, Acting Administrator of the FHWA (collectively the
"Federal Defendants").[2]  The Court has considered the parties' papers, relevant legal authority, the
record in this case, and the parties' arguments at the hearing on the motions.

        The Court HEREBY DENIES Plaintiffs' motion and GRANTS, IN PART, AND DENIES,

---

[1]    The parties address the Plaintiffs as a collective unit.  The Court has made every effort to
distinguish between the Plaintiffs as it has evaluated their motion to determine whether they have
met their respective burdens to show they are entitled to relief.

[2]    Secretary Chao and Acting Administrator Hendrickson are automatically substituted in as
defendants pursuant to Federal Rule of Civil Procedure 25(d).

1

United States District Court
Northern District of California

IN PART, the Federal Defendants' motion.

## BACKGROUND

**A.      Factual Background.**

This litigation arises out of the construction of 5.9-mile-long segment of U.S. Highway 101, which bypasses the City of Willits, California (the "Willits Bypass Project"), and post-construction mitigation projects in the area. (*See, e.g.,* Caltrans Defendants' Administrative Record ("CT AR"), 000015-16, 000038-39; Caltrans Supplemental Administrative Record ("CT Supp. AR) 001036-40.)[3]  It is the second time this Court has considered an environmental challenge to the Willits Bypass Project.  *See, e.g., Ctr. for Biol. Diversity v. Cal. Dep't of Transp.*, No. 15-cv-2172-JSW, 2013 WL 6698740 (N.D. Cal. Dec. 19, 2013).

It is undisputed that the FHWA and Caltrans issued a final Environmental Impact Statement ("EIS") for the Willits Bypass Project in October 2006.  In December 2006, the agencies issued a Record of Decision, which approved a variation of a four-lane freeway ("Modified Alternative J1T").  (CT AR 000001-1928 (Final EIS, Vols. 1-4); CT AR 001929-1949 (Record of Decision).)  The Final EIS stated there would be no adverse effect on historic properties, if an environmentally sensitive area was established.  The State Historic Property Officer ("SHPO") concurred in that finding.  (CT AR 000072-73, 000163-64.)

In 2007, Caltrans decided to proceed with phased construction, because of funding constraints.  "During the first phase of the project, …, Caltrans plan[ned] to complete a two-lane bypass, and it plans to complete the remaining two lanes as funding becomes available." *See Ctr. for Biol. Diversity*, 2013 WL 6698740, at *2.  This litigation focuses on the first phase. Construction on the first phase of the Willits Bypass Project is complete, and it was opened to traffic in November 2016.  (CT Supp. AR 001036.)  The second phase of the Willits Bypass Project remains unfunded.

---

[3]      The Caltrans Defendants are the California Department of Transportation and Malcolm Dougherty.  When the Court cites to the Caltrans Defendants' administrative record and their supplemental administrative record, it has omitted the document number and cites only to page numbers.  Therefore, instead of citing the Caltrans Defendants' AR as 1:000001-001928 (Document 1, pages 000001-001928), the Court simply cites it as "CT AR 0000001-1928."

United States District Court
Northern District of California

According to Plaintiffs, at the time the final EIS was issued, "Caltrans had only identified one archaeological site eligible for registry on the National Register of Historic Places" ("NHRP"), and they claim that "[s]ince 2013, Caltrans has identified at least thirty additional archaeological sites eligible for registry on the" NRHP. (Second Amended Complaint ("SAC") ¶¶ 17, 19.)

On June 4, 2013, Coyote Valley's Tribal Chairman, Michael Hunter, wrote to Charles Felder, a director at Caltrans, and requested "government-to-government" consultation. (Federal Highway Administration Administrative Record ("FHWA AR") 0007; CT AR 011681-82.)[4] On June 17, 2013, Mr. Felder responded to Mr. Hunter's letter. (CT AR 011694-95.) On June 25, 2013, Kendall Schinke, an Environmental Branch Chief at Caltrans, sent a letter to Coyote Valley, via Priscilla Hunter, enclosing copies of cultural resources documents prepared for the Willits Bypass Project. In that letter, Ms. Schinke stated that "[a]s we discussed on the phone, to request formal government-to-government consultation contact Vincent Mammano, Division Administrator at the [FHWA's] California Division[.]" (*Id.*, 011698.)

On February 18, 2015, representatives of Coyote Valley met with representatives of Caltrans, the FHWA, and the Army Corps of Engineers. (*Id.*, 013217-18, 17527). On March 17, 2015, Chairman Hunter sent a letter to Mr. Felder, in which Coyote Valley continued to raise concerns about the Willits Bypass Project. (*Id.,* 013217-18.) On the same day, Chairman Hunter wrote to Mr. Mammano acknowledging the government-to-government consultation meeting on February 18, 2015. (*Id.,* 017305-07.) In that letter, Chairman Hunter stated that "[t]he primary and ongoing request we articulated at this meeting was the need for a Supplemental EIS to contend with the many ancestral archaeological sites that have been discovered subsequent to the approval" of the Final EIS "both in the Project Area and Mitigation parcels" of the Willits Bypass Project. (*Id.*, 017305.)

Chairman Hunter also asserted that "Caltrans failed to exercise due diligence in the initial

---

[4] Both parties have submitted the administrative records on CD-ROMs. The June 4 letter is attached to the email at FHWA AR 0007 by way of a hyperlink in the subject of the email "Coyote Valley Bank of Pomo Indians ltr.pdf."

archaeological survey efforts for the project" and "failed to adequately protect sites discovered subsequent to the EIS approval for the project." (*Id.*) Chairman Hunter asked that the "FHWA intervene to assist us in assuring that our ancestral archaeological sites in the project area and mitigation lands of the Willits Bypass are protected." (*Id.*) Chairman Hunter also asked that "FHWA reassume the federal responsibility for environmental review of this project[.]"[5] (*Id.*; *see also id.*, 017307.)

It is undisputed that, on July 1, 2007, the FHWA and Caltrans entered into a Memorandum of Understanding ("2007 MOU") relating to the Surface Transportation Project Pilot Delivery Program (the "Pilot Program"), 23 U.S.C. section 327.[6] (*See* Glazer Decl., ¶ 2; Dkt. No. 32-1, Glazer Decl., Ex. A (2007 MOU §§ 1.1.1, 3.1.1).) Under the Pilot Program, the Secretary of Transportation could assign and a state could "assume, the responsibilities of the Secretary with respect to one or more highway projects within" that state under the National Environmental Policy Act ("NEPA"). 23 U.S.C. § 327(a)(2)(A). The Pilot Program also provided that, if a state assumed responbility for a project under Section 327(a)(2)(A), "the Secretary may assign to the State, and the State may assume, all or part of the responsibilities of the Secretary for environmental review, consultation, or other action required under any Federal environmental law pertaining to the review or approval of a specific project." *Id.* § 327(a)(2)(B)(i).

If a state assumes "responsibility under subsection (a)(2) [it] shall be solely responsible and solely liable for carrying out, in lieu of the Secretary, the responsibilities assumed under subsection (a)(2), until the program is terminated as provided in subsection (i)." *Id.* § 327(e).

---

[5]     Round Valley has directed the Court to any evidence that shows it made a similar request to the Federal Defendants.

[6]     The Pilot Program is now permanent. On September 25, 2012, the FHWA and Caltrans entered into a MOU that extended the assignments and assumptions of responsibilities set forth in the 2007 MOU. (*See* Dkt. No. 32, Declaration of David B. Glazer ("Glazer Decl."), ¶ 2; Dkt. No. 32-2, Glazer Decl., Ex. A at ECF p. 26-31 (Memorandum of Understanding dated September 2012 and effective on October 1, 2012 ("2012 MOU").) On December 23, 2016, the parties entered into a MOU that renewed Caltrans' participation in the program. That MOU took effect on January 1, 2017 ("2017 MOU"). (CT Supp. AR 2905-31.) The California Legislature did not renew the State's wavier of sovereign immunity under California Streets and Highways Code section 820.1 until March 30, 2017. As a result, the Caltrans Defendants' assumption of responsibilities was suspended under Section 12.3.2 of the 2017 MOU until that date.

4

1   "Any responsibility of the Secretary not explicitly assumed by the State by written agreement

2   under this section shall remain the responsibility of the Secretary."  *Id.* § 327(a)(2)(D).

3          The Willits Bypass Project is covered by the terms of the 2007 MOU.  Under that MOU,

4   the FHWA assigned and Caltrans assumed "all of the USDOT Secretary's responsibilities under

5   NEPA …" and "all of the USDOT Secretary's responsibilities for environmental review,

6   consultation, or other such action pertaining to the review or approval of a specific project as

7   required under" Section 106 of the National Historic Preservation Act ("NHPA"), and 23 U.S.C.

8   section 138 and Section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. section

9   303 (the "Federal Highway Statutes").  (*See* Glazer Decl., ¶ 2; Dkt. No. 32-1, Glazer Decl., Ex. A

10  (2007 MOU §§ 1.1.1, 3.1.1, 3.2.1.I, 3.2.1.Y).)  The terms of the 2007 MOU also provide that

11  "Caltrans shall be solely liable and solely responsible for carrying out all of the USDOT

12  Secretary's responsibilities it has assumed under part 3 of this MOU subject to the limitations of

13  the Eleventh Amendment waiver acknowledged in section 4.3.1 of this MOU.  The FHWA and

14  USDOT shall have no responsibility or liability for the performance of the responsibilities

15  assumed by Caltrans, including any decision or approval made by Caltrans while participating in

16  the Pilot Program."  (*Id.* § 6.1.)

17         However,

18             [t]he USDOT Secretary's responsibilities for government-to-
               government consultation with Indian Tribes … may not be assumed
19             by Caltrans under this MOU.  FHWA remains responsible for all
               government-to-government consultation, including initiation of
20             tribal consultation, unless otherwise agreed as described in this
               section.  A notice from Caltrans to an Indian tribe advising the tribe
21             of a proposed activity is not considered "government-to-government
               consultation" within the meaning of this MOU.  If FHWA
22             determines based on the consultation process that Caltrans has
               adequately resolved any project specific tribal issues or concerns,
23             then the FHWA's role in the environmental process shall be limited
               to carrying out the government-to-government consultation process.
24             *If a project related concern or issue is raised in a government-to-
               government consultation process with an Indian tribe … and is*
25             *related to NEPA or another federal environmental law for which*
               *Caltrans has assumed responsibilities under this MOU, and either*
26             *the Indian tribe or the FHWA determines that the issue or concern*
               *will not be satisfactorily resolved by Caltrans, then the FHWA shall*
27             *reassume all or part of the responsibilities for processing the*
               *project.*  In this case, the provisions of section 9.1 concerning
28             FHWA initiated reassumptions shall apply.

                                              5

1   (*Id.* § 3.2.3 (emphasis added).)[7]

2       Section 9.1 of the MOU sets forth three circumstances that may warrant the FHWA

3   reassuming responsibilities that had otherwise been assigned to Caltrans. (*Id.* § 9.1.1(A)-(C).) If

4   the FHWA makes a determination to reassume responsibilities assigned to Caltrans, "the FHWA

5   will informally notify Caltrans of the FHWA's determination" and "will provide Caltrans written

6   notice of its determination including the reasons for its determination." (*Id.* § 9.1.2.) Caltrans has

7   the opportunity to respond and to object. The FHWA then makes a final determination based on a

8   number of factors, including any comments and objections submitted by Caltrans. (*Id.*)

9       It also is undisputed that the FHWA, Caltrans, California's SHPO, and the Advisory

10  Council on Historic Preservation (the "Council") entered into a Statewide Programmatic

11  Agreement regarding compliance with Section 106 of the NHPA as it pertains to the

12  administration of the Federal-aid Highway Program in California. That programmatic agreement

13  had an effective date of January 1, 2004, and it was amended and extended with an effective date

14  of January 1, 2014. (CT AR 17577-17630, First Amended Programmatic Agreement ("FAPA").)

15  The FAPA states that as a result of the 2007 MOU, among others, "Caltrans is deemed to be a

16  federal agency for all Federal-aid Highway projects it has assumed[.]" (FAPA at 1.) It also notes

17  that the FHWA as a federal agency has a "unique legal relationship with Indian tribes …, and

18  while an Indian tribe may agree to work directly with Caltrans as part of the 36 CFR 800

19  compliance process, the FHWA … remain[s] legally responsible for government-to-government

20  consultation with Indian tribes[.]" (FAPA at 2; *see also* FAPA, Stipulations IV.B & VI.B-C.) The

21  FAPA also accounts for "post-review" discoveries. (*Id.*, Stipulation XV.) The parties to this

22  lawsuit have not entered into a specific programmatic agreement or memorandum of agreement

23

24

_____

25  [7]     It is evident from the record that the assignment of responsibilities has created confusion
    regarding the nature and scope of "government-to-government consultation" and the nature and
26  scope of the Section 106 consultation process described below. Because the Federal Defendants
    are not "decision maker[s]" on the Willits Bypass Project, Mr. Mammano stated that he viewed his
27  role as a "mediator" between Plaintiffs and the Caltrans Defendants and to make sure the "correct
    process was being followed." (CT AR 200547; *see also id.* 011681-82 (letter requesting
28  "government-to-government" consultation with Caltrans), 012565.)

for the Willits Bypass Project.[8]

The Court shall address additional facts as necessary in the analysis.

**B.    Procedural History.**

On October 30, 2015, Plaintiffs filed the original complaint in this case and alleged the Federal Defendants and the Caltrans Defendants each violated NEPA, the Federal Highway Statutes, and Section 106 of the NHPA. The Federal Defendants moved to dismiss. Before the Court resolved that motion, the parties attempted to, but could not, settle the matter.

On August 2, 2016, the Court granted the Federal Defendants' motion to dismiss, with leave to amend. On August 26, 2016, Plaintiffs filed their first amended complaint, asserting the same claims for relief. On September 7, 2016, all Defendants moved to dismiss. In the interim, the parties continued to pursue settlement efforts but, again, were not successful. On January 23, 2017, the Court granted, in part, and denied, in part, the Caltrans Defendants' motion to dismiss. *Round Valley Indian Tribes of Cal. v. U.S. Dep't of Transp.*, No. 15-cv-04987-JSW, 2017 WL 282980 (N.D. Cal. Jan. 31, 2017). On March 10, 2017, the Court granted, in part, and denied, in part, the Federal Defendants' motion to dismiss and gave Plaintiffs leave to amend. *Round Valley Indian Tribes of Cal. v. U.S. Dep't of Transp.*, 15-cv-04987-JSW, 2017 WL 950956 (N.D. Cal. Mar. 10, 2017). On April 7, 2017, Plaintiffs filed their SAC, asserting the same claims for relief.

As a result of the Court's rulings on the Federal Defendants' motions to dismiss, Plaintiffs' claims against the Federal Defendants have been limited as follows: (1) the Federal Defendants violated Section 106 of the NHPA by failing to engage in government-to-government consultation with Plaintiffs ("the NHPA consultation claim"); and (2) after February 18, 2015, the date on which the Plaintiffs demanded that the Federal Defendants reassume responsibility for the Willits Bypass Project, the Federal Defendants directly violated the NHPA, NEPA, and the Federal Highway Statutes by failing to act in accordance with the requirements of those statutes.

---

[8]    The terms of the FAPA also provide that "[i]f the FHWA determines that any project-specific tribal issues or concerns will not be satisfactorily resolved by Caltrans when Caltrans is deemed a federal agency, then FHWA may reassume all or part of the federal responsibilities for environmental review pursuant to MOU's." (FAPA, Stipulation IV.E.3.)

**ANALYSIS**

**A.      Standard of Review under the Administrative Procedure Act ("APA").**

Plaintiffs contend that the Federal Defendants violated the NHPA, NEPA, and the Federal Highway Statutes "by failing to properly engage in government-to-government consultation with Plaintiffs on the [Willits Bypass] Project, by failing to identify or protect Plaintiffs' cultural, sacred, and historical resources or attempt to mitigate the impact the [Willits Bypass] Project had on them, and by refusing to reassume the" Willits Bypass Project.  (Dkt. No. 131, Plaintiffs' Mot. at 12:8-11.)  Plaintiffs bring these claims pursuant to the APA.  The APA permits a court to "compel agency action unlawfully withheld or unreasonably delayed" or to "hold unlawful and set aside agency action, findings and conclusions found to be - arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. §§ 706(1)-(2)(A).  "A claim to compel action," under Section 706(1), "may proceed 'only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*.'"  *Grand Canyon Trust v. Williams*, 98 F. Supp. 3d 1044, 1051 (D. Ariz. 2015) (quoting *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004)) (emphasis in *Norton*).

A court "will reverse a decision as arbitrary and capricious only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008), *overruled on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008).

**B.      Evidentiary Issues.**

The Federal Defendants move to strike declarations submitted by Priscilla Hunter (Dkt. No. 134), Eddie Knight (Dkt. No. 135), and Mike Knight (Dkt. No. 136), on the basis that the declarations are extra-record evidence.  The declarations include exhibits that come from the Caltrans Defendants' administrative record.  Those exhibits, therefore, would not constitute extra-record evidence.  However, the declarants do not simply attest that the exhibits are what they purport to be.  Rather, Ms. Hunter sets forth her views of the consultation process.  Mr. Eddie

Knight discusses issues relating to tribal monitors and how they should be used during a project like the Willits Bypass Project. Mr. Mike Knight, who is Chairman of the Sherwood Valley Band of Pomo Indians ("Sherwood Valley"), discusses Sherwood Valley's decision to not sign a draft programmatic agreement.

When a court is presented with a case brought under APA, its task "is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record" presented by the agency. *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985). In the Ninth Circuit, a court may consider extra-record evidence "(1) if necessary to determine 'whether the agency has considered all relevant factors and has explained its decision,' (2) 'when the agency has relied on documents not in the record,' … (3) 'when supplementing the record is necessary to explain technical terms or complex subject matter,'" or (4) when a plaintiff shows an agency has acted in bad faith. *Sw. Ctr. for Bio. Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996) (quoting *Inland Empire Public Lands Council v. Glickman*, 88 F.3d 697, 703-04 (9th Cir. 1996)).

The Court finds Plaintiffs have not shown any of these exceptions apply. First, none of the declarants are employees of the Federal Defendants. *See, e.g., Friends of the Payette v. Horseshoe Bend Hydroelectric Co.*, 988 F.2d 989, 997 (9th Cir. 1993) ("[w]hen a failure to explain action frustrates judicial review, the reviewing court may obtain *from the agency*, through affidavit or testimony, additional explanations for the agency's decisions") (emphasis added). Plaintiffs also fail to show *how* the administrative record is insufficient to explain the Federal Defendants' decisions; they simply argue it is.[9] Plaintiffs do not suggest the Federal Defendants relied on any documents that are not in the administrative record, and they have not demonstrated the Federal Defendants acted in bad faith. Finally, Plaintiffs have not demonstrated how the declarations might explain any technical terms or complex subject matter. Accordingly, to the extent

---

[9] In addition, the Court set deadlines for the parties to address any disputes about the sufficiency of the administrative record, which were extended several times while the parties attempted to settle this matter. The Caltrans Defendants lodged their administrative record on July 7, 2016. Plaintiffs did not challenge its content. The Federal Defendants lodged their administrative record in May 2017. Again, Plaintiffs did not challenge its content.

Plaintiffs' claims are premised upon actions the Federal Defendants are alleged to have taken, the Court sustains, in part, the Federal Defendants' objections to the substance of the declarations.

Plaintiffs also argue that their claims are premised on the Federal Defendants' failure to act, under Section 706(1). In such cases, "review is not limited to the record as it existed at any single point in time, because there is no final agency action to demarcate the limits of the record." *Dombeck*, 222 F.3d at 560. To the extent that is true, the Court overrules, in part, the Federal Defendants' objections. While the Court will not strike the declarations, it will consider them only where Plaintiffs have cited to particular paragraphs of a declaration in their briefs and only if the cited paragraphs are necessary to resolve these motions. *See, e.g., Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("As the Seventh Circuit observed in its now familiar maxim, '[j]udges are not like pigs, hunting for truffles buried in briefs.'") (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)); *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996) (stating that it is not a court's task "to scour the record in search of a genuine issue of triable fact") (quoting *Richards v. Combined Ins. Co. of Amer.*, 55 F.3d 247, 251 (7th Cir. 1995)).[10]

## C. The Court Concludes Plaintiffs Have Standing and the Case is Not Moot.

The Federal Defendants' cross-motion focuses on the merits of the Plaintiffs' claims, but they argue, in the alternative, that Plaintiffs do not have standing and that the claims are moot. Because those arguments relate to threshold jurisdictional issues, the Court addresses them at the outset.

### 1. Standing.

The requirements of Article III standing are well-established. "[A] plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed

---

[10] The Court's rulings in this section also apply to the supplemental declarations of Eddie Knight and Owen Knight (Dkt. Nos. 144-1, 144-14), which Plaintiffs submitted with their combined opposition and reply brief.

by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (quoting *Lujan v. Def. of Wildlife,* 504 U.S. 555, 560-61 (1992)).

The Federal Defendants do not challenge Plaintiffs' ability to satisfy the first two prongs of this test. Rather, they argue Plaintiffs cannot show their injuries can be redressed. The Federal Defendants do not dispute that some mitigation work remains to be done on the Willits Bypass Project. Therefore, if Plaintiffs do prevail and if the Court orders the Federal Defendants to comply with the Section 106 consultation requirements or the other procedural requirements of NEPA and the Federal Highway Statutes, the Court could redress the injuries Plaintiffs claim to have suffered. *See, e.g., Grand Canyon Trust*, 98 F. Supp. 3d at 1057 (holding that plaintiffs had satisfied redressability requirement where, assuming plaintiffs succeeded on the merits, the court would order the defendants to follow NEPA and NHPA procedures which "could certainly redress Plaintiffs' procedural and aesthetic injuries").

Accordingly, the Court denies, in part, the Federal Defendants' cross-motion for summary judgment.

### 2. Mootness.

The Federal Defendants also argue that construction on the Willits Bypass Project is complete, rendering Plaintiffs' claims moot. "A case becomes moot whenever it 'los[es] its character as a present, live controversy of the kind that must exist if we are to avoid advisory opinions on abstract propositions of law.'" *West v. Sec'y of the Dep't of Transp.*, 206 F.3d 920, 924 (9th Cir. 2000) (quoting *Hall v. Beals*, 396 U.S. 45, 48 (1969) (alterations in *West*). In order for a case to be justiciable, the "controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy, admitting of a specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical set of facts." *Id.* (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937)).

In *West*, the plaintiff challenged the FHWA's determination that a highway interchange project, which would be conducted in two phases, satisfied the criteria for a categorical exclusion under NEPA. 206 F.3d at 923-24. One of the defendants argued the case was moot, because

construction had been completed on the first phase of the project, and the interchange had been opened to traffic. *Id.* at 924 & n.1. The court rejected this argument. It reasoned that the second stage of the project had not begun, and "upon finding that defendants failed to comply with NEPA, our remedial powers would include remanding for additional environmental review and, conceivably, ordering the interchange closed or taken down. … The fact that Stage 1 of the interchange has been constructed and is operational is insufficient to render the case moot." *Id.* at 925-26; *cf. Columbia Basin Land Protection Ass'n v. Schlesinger*, 643 F.2d 585, 591 n.1 (9th Cir. 1981). The *West* court reached this conclusion, even though it did not order that the interchange be taken down as a remedy. *West*, 206 F.3d at 929.

The Court finds the facts here are analogous to the facts in *West*. The construction of the first phase of the Willits Bypass is complete and open to traffic, and the second phase has not yet begun, although it has not been funded. If the Court were to find the Federal Defendants violated any of the statutes at issue, the Court could remand for additional environmental review and, as in *West*, "however cumbersome or costly it might be" conceivably order the Willits Bypass closed or taken down. 206 F.3d at 925 n.1.

Accordingly, the Court concludes that the Federal Defendants have not met their "heavy" burden to show this case is moot, and it denies, in part, their cross-motion on that basis. *Id.* at 924.

## D. The NHPA Consultation Claim.

### 1. Statutory and Regulatory Framework.

Section 106 of the NHPA ("Section 106") requires that a federal agency with the "authority to license any undertaking, prior to the approval or expenditure of any Federal funds on the undertaking or prior to the issuance of any license, shall take into account the effect of the undertaking on any historic property." 54 U.S.C. § 306108. An "undertaking" is "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including those carried out by or on behalf of a Federal agency; those carried out with Federal financial assistance; and those requiring a Federal permit, license or approval." 36 C.F.R. § 800.16(y). Plaintiffs allege, and the Federal Defendants have not disputed, that the Willits Bypass Project qualifies as an "undertaking."

Section 106 requires an agency to "stop, look, and listen" to "the effects of its programs." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999). Therefore, a federal agency must

> make a reasonable and good faith effort to identify historic properties; determine whether identified properties are eligible for listing on the National Register …; assess the effects of the undertaking on any eligible historic properties found; determine whether the effect will be adverse; and avoid or mitigate any adverse effect. The [agency] must confer with the [SHPO] and seek the approval of the [Council].

*Muckleshoot*, 177 F.3d at 805 (brackets in original); *see also* 36 C.F.R. §§ 800.3 (initiation of process), 800.4 (identification of historic properties), 800.5 (assessment of adverse effects), and 800.6 (resolution of adverse effects). In addition, as part of this process, a federal agency must engage in consultation with a number of parties. *See* 36 C.F.R. § 800.2(c). "Consultation means the process of seeking, discussing, and considering the views of other participants, and, where feasible, seeking agreement with them regarding matters arising in the section 106 process. The Secretary's 'Standards and Guidelines for Federal Agency Preservation Programs pursuant to the National Historic Preservation Act' provide further guidance on consultation." 36 CFR § 300.16(f).

"When an undertaking may affect properties of historic value to an Indian tribe on non-Indian lands, the consulting parties shall afford such tribe the opportunity to participate as interested persons." 36 C.F.R. § 800.1(c)(2)(iii); *see also Te-Moak Tribe of Western Shoshone of Nev. v. U.S. Dep't of the Interior*, 608 F.3d 592, 607 (9th Cir. 2010) (federal agencies required "to consult with tribes that 'attach[] religious and cultural significance to historic properties that may be affected by an undertaking'") (brackets in original). When an agency engages in consultation with a tribe, it "must recognize the government-to-government relationship between the Federal Government and Indian tribes." *Id.* § 800.2(c)(2)(ii)(C). Thus, "the agency official shall consult with representatives designated or identified by the tribal government or the governing body[.]" *Id.*

A federal agency must provide a tribe with "a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic

13

properties, including those of traditional religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects." 36 C.F.R. § 800(c)(2)(ii)(A). A failure to engage in government-to-government consultation "may be grounds for setting aside an agency action." *Colorado River Indian Tribes v. Dep't of the Interior*, No. ED CV 14-02504 JAK (SPx), 2015 WL 12661945, at *13 (C.D. Cal. June 11, 2015) (citing *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 797 (9th Cir. 2006)).

The Ninth Circuit recently held that "the current definition of 'undertaking'" does not encompass "a continuing obligation to evaluate previously approved projects." *Havasupai Tribe v. Provencio,* 876 F.3d 1242, 1251 (9th Cir. 2017). However, NHPA's implementing regulations do address post-review discoveries and an agency's continuing obligations under the NHPA. *Id.,* (citing 36 C.F.R. § 800.13). "An agency official may develop a programmatic agreement pursuant to § 800.14(b) to govern the actions to be taken when historic properties are discovered during the implementation of an undertaking." *Id.* § 800.13(a)(1).[11] If there is no process in place under Section 800.13(a) and "historic properties are discovered or unanticipated effects on historic properties found after the agency official has completed the section 106 process … , the agency official shall make reasonable efforts to avoid, minimize, or mitigate adverse effects to such properties[.]" *Id.* § 800.13(b). If that occurs and construction has not commenced, the agency official must "consult to resolve adverse effects pursuant to § 800.6[.]" *Id.* § 800.13(b)(1). If the undertaking has been approved and construction has commenced, an agency official must "determine actions that the agency official can take to resolve adverse effects, and notify the SHPO/THPO [tribal historic preservation officer], any Indian tribe … that might attach religious and cultural significance to the affected property, and the Council within 48 hours of the discovery." *Id.* § 800.13(b)(3).

//

---

[11] Section 800.14(b) provides that the Council and a federal agency "may negotiate a programmatic agreement to govern the implementation of a particular program or the resolution of adverse effects from certain complex project situations or multiple undertakings."

14

1    **1.    The Federal Defendants' Statute of Limitations and Laches Defenses.**

2        **a.    Statute of Limitations.**

3        Plaintiffs allege that the Federal Defendants failed to engage in government-to-government

4    consultation "[a]t the Final EIS/EIR stage, when Caltrans and FHWA stated there would be 'no

5    effect' when they did not know what the effects would be[.]"  (SAC ¶ 96.)[12]  The Federal

6    Defendants argue that a claim based on approval of the Final EIS and the subsequent Record of

7    Decision is barred by the relevant statute of limitations.  "[E]very civil action commenced against

8    the United States shall be barred unless the complaint is filed within six years after the right of

9    action first accrues."  28 U.S.C. § 2401(a).  The record of decision for the Willits Bypass Project

10   was issued in 2007.  At the hearing, Plaintiffs conceded that a claim based the Federal Defendants'

11   conduct in connection with approval of the Final EIS would be barred.[13]  To the extent Plaintiffs'

12   premise the NHPA consultation claim on conduct prior to October 30, 2009, the Court finds the

13   claim is barred by Section 2401(a).

14       Accordingly, the Court grants, in part, the Federal Defendants' cross-motion on that basis.

15       **b.    Laches.**

16       The Federal Defendants also argue that Plaintiffs' NHPA consultation claim is barred by

17   laches.  In order to prevail on this defense, the Federal Defendants must show that: (1) Plaintiffs

18   lacked diligence; and (2) the Federal Defendants suffered prejudice.  *See Apache Survival Coal. v.*

19   *United States*, 21 F.3d 895, 905 (9th Cir. 1994).  In environmental cases, including NHPA cases,

20   "these criteria must be applied in light of the principle that laches must be invoked sparingly in

21   suits brought to vindicate the public interest."  *Id.* (internal quotations and alterations omitted); *see*

22   *also id.* at 906 (determining this standard should apply in NHPA cases).

23

24   ─────────────────
     [12]    One document in the record suggests that, at some point, "all of the tribes in the Willits
25   area … deferred consultation to the Sherwood Valley Rancheria[.]"  (FHWA AR 0007.)
     However, the Federal Defendants have not directed the Court to a document that shows Plaintiffs
     did, in fact, "defer" their interest in Section 106 consultation requirements to Sherwood Valley.

26

27   [13]    Any claims based on approval of the Final EIS also would be barred by 23 U.S.C. section
     139(*l*)(1), which at the time the Final EIS was approved required a claim be filed within 180 days
     of publication in the Federal Register of the final approval of a highway project.  That limitations
28   period has been reduced to 150 days.

                                        15

The Federal Defendants do not articulate at what point the Court should start evaluating Plaintiffs' alleged lack of diligence.[14]  Because the Court has determined that a claim based on conduct prior to October 30, 2009 is barred by the statute of limitations, and because Plaintiffs conceded that a claim based on the approval of the Final EIS would be barred, the Court will evaluate the period between October 31, 2009 and October 30, 2015, when Plaintiffs filed suit.

The Federal Defendants direct the Court to Caltrans' consultation log to support their argument that Plaintiffs did not act diligently.  That log reflects communications from *Caltrans* to some members of Plaintiffs' tribes, but it does not reflect any communication by the Federal Defendants to Plaintiffs prior to June 2013.  The Federal Defendants' consultation log does not reflect any communications from the Federal Defendants to *Plaintiffs* regarding government-to-government consultation prior to 2013.  (*See, e.g.,* FHWA AR 0001-06 (discussing Sherwood Valley) and 0007 (forwarding June 4 letter from Coyote Valley).)  Yet, with the exception of the approval of the Final EIS, most of the events about which Plaintiffs complain relate to post-review discoveries that occurred once construction started in 2013.  Those events fall within the generally applicable six year statute of limitations.  The Court finds the Federal Defendants have not met their burden to show inexcusable delay by the Plaintiffs, at least to the extent the NHPA consultation claim does not relate to approval of the Final EIS.

Accordingly, the Court concludes that the Federal Defendants have not met their burden to

---

[14]     The record does show that Plaintiffs' members were made of aware of the Willits Bypass Project early in its development.  For example, on December 7, 1987, Caltrans sent a letter inviting a number of entities and individuals to a public meeting on December 15, 1987 to address the feasibility of constructing a four-lane freeway bypass around the City of Willits.  Ms. Hunter, as Commissioner of Coyote Valley, was copied on that letter.  (CT AR 017344, 17348.)  Ms. Hunter also is listed on a "Native American Notification List" dated December 22, 1997 as Chair of Coyote Valley.  (CT AR 043041; *see also* CT AR 043050.)  Caltrans' consultation logs for the Willits Bypass Project also show that Caltrans' representatives included Ms. Hunter in discussions about the Willits Bypass Project, although in many entries Ms. Hunter is identified as a representative of the Native American Heritage Commission ("NAHC") rather than as a representative of Coyote Valley.  (*See, e.g.,* CT AR at 011520 (entry dated 11/28/90); *see also* CT AR 17362, 17365, 207286.)  Caltrans' representatives also included Norman Whipple, who in 2000 was listed as the President of Round Valley, in discussions about the Willits Bypass Project as early as 1998.  (CT AR at 011515, 011518, 011520, 043050; *see generally* 011515-79 (Consultation Log).)

show Plaintiffs' NHPA consultation claim is barred by laches, and it denies, in part, their cross-motion on that basis.

### 2. The Merits of the NHPA Consultation Claim.

Plaintiffs allege the Federal Defendants failed to engage in government-to-government consultation "[w]hen Caltrans, FHWA, and DOT commenced construction without taking appropriate steps to protect Plaintiffs' historic properties, cultural resources, and sacred sites encountered during construction activities and on the mitigation lands of the Willits Bypass Project; and … [w]hen Caltrans, FHWA, and DOT failed to correct these egregious errors once they discovered additional archaeological sites eligible for registry on the NRHP." (SAC ¶ 96.)

Plaintiffs do not identify any aspect of the Willits Bypass Project arising after the Final EIS and Record of Decision were issued, which would be considered a separate "undertaking" that would require the Federal Defendants to initiate a new Section 106 consultation process. That is not necessarily fatal to Plaintiffs' claim, because as set forth above, the NHPA's implementing regulations contemplate post-review discoveries may occur. 36 C.F.R. § 800.13. It is undisputed that there have been post-review discoveries. In addition, although the FAPA governs all highway projects in California, it is undisputed that there is not a programmatic agreement specific to the Willits Bypass Project in place. Further, according to the record, there was no plan in place for post-review discoveries on the Willits Bypass Project, which implicates the provisions of Stipulation XV.B of the FAPA. (*See, e.g.,* FHWA AR 0008, hyperlink to "Notification of PRD #1 on the WBP.docx".) Compliance with procedures set forth in a programmatic agreement will "serve as a 'substitute' for the regulations that concerns consultation for purposes of the agency's compliance with Section 106." *Colorado River Indian Tribes*, 2015 WL 12661945, at *13. Stipulation XV.B does not clearly call for additional government-to-government consultation.

However, Coyote Valley did formally request government-to-government consultation with the Federal Defendants, although the record does not show Round Valley made a similar request. In order to satisfy their responsibility to engage in government-to-government consultation, the Federal Defendants were required to ensure Plaintiffs had a "reasonable opportunity" to, *inter alia*, identify their concerns about any such discoveries, articulate their

views on the Willits Bypass Project's effects on those discoveries and participate in the resolution

of any adverse effects to those discoveries "with representatives designated or identified by the

tribal government[.]" *See Te-Moak Tribe*, 608 F.3d at 608; 36 C.F.R. § 800.2(c)(2)(ii)(C).

Plaintiffs argue the facts of this case are analogous to *Pueblo of Sandia v. United States*, 50

F.3d 856 (10th Cir. 1995). In that case, the court found that the Forest Service failed to follow up

on information from the plaintiffs, even though it knew the plaintiff tribes might be "hesitant to

divulge the type of information" it was seeking about the traditional cultural properties at issue. *Id.*

at 860-61. The court also found the Forest Service did not act in good faith, because it had

withheld information from the SHPO that, once disclosed, caused the SHPO to withdraw its initial

concurrence in the Forest Service's determination that there was no evidence that traditional

cultural properties were located in the relevant area. *Id.* at 858, 862-63. Plaintiffs have not

pointed the Court to any similar conduct by the Federal Defendants.

Rather, after Plaintiffs requested government-to-government consultation, the record

shows that the Federal Defendants and designated tribal representatives communicated by

telephone regarding the Plaintiffs' concerns, attempted to negotiate a project specific

programmatic agreement, and attended face-to-face meetings about the post-review discoveries

and Plaintiffs' concerns. (*See, e.g.,* CT AR 017499, 024931, 200547-48; FHWA AR 0034-35,

0038, 0039, 0054, 0063-65, 0066 and 0069 (and embedded attachments); *see also* CT AR 011534

(entry dated 7/30/13), 011535 (entries dated 8/11/13, 10/23/13), 011536-38 (entries dated 12/5/13,

1/17/14, 1/30/14, 1/31/14, 3/26/14, 4/26/14, 4/29/14), 011546 (entry dated 2/18/15), 011551-52

(entries dated 4/10/15, 4/15/15, 4/16/15), 011556-57 (entries dated 5/11/15, 5/14/15, 5/15/15,

5/19/15), 011558 (entry dated 6/15/15); FHWA AR at 0018-19 (entries dated 10/23/13,

12/5/13,1/30/14, 3/26/14, 4/26/14, 4/29/14).) Those efforts apparently continued after Plaintiffs

filed this case. (*See, e.g.,* FHWA AR 0394-98.)[15] Plaintiffs also do not identify any new

---

[15]       The Court also notes that a letter from the Council acknowledges there were unanticipated
post-review discoveries, which "presented challenges to all consulting parties, particularly the
Indian tribes, as we attempted to develop an appropriate treatment plan to minimize harm to
historic properties, all the while seeing additional harm come to more and more properties as
construction continued." (CT AR 014891.) The Council expressed its view that notwithstanding
these problems and the unsuccessful efforts to develop a project specific programmatic agreement,

1   information they would have provided to the Federal Defendants if they had been consulted earlier

2   in the construction process.

3       Accordingly, the Court concludes the record shows the Federal Defendants gave Plaintiffs

4   the reasonable opportunity to address their concerns about the post-review discoveries and worked

5   with them in an effort to resolve those concerns. The Court denies Plaintiffs' motion for summary

6   judgment and grants the Federal Defendants' cross-motion for summary judgment on the NHPA

7   consultation claim.

8   **E.    The NHPA Non-Consultation Claim, the NEPA Claim, and the Federal Highway
9         Statutes Claim.**

10      Plaintiffs also argue that once Plaintiffs advised the Federal Defendants that, in their view,

11  the Caltrans Defendants were not satisfactorily resolving project related issues and concerns, the

12  Federal Defendants should have reassumed their responsibilities under the NHPA, NEPA, and the

13  Federal Highway Statutes. The Federal Defendants argue that Section 3.2.3 does not require them

14  to reassume responsibilities for the Willits Bypass Project; rather, the decision to do so is

15  discretionary.

16      "Interpretation of a contract is a matter of law," as is the determination of whether a

17  contract is ambiguous. *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210

18  (9th Cir. 2000).[16] The Court must read the 2007 MOU "as a whole" and must interpret every part

19  "with reference to the whole, with preference given to reasonable interpretations." *Id.* The Court

20  gives terms of the 2007 MOU "their ordinary meaning," and if those terms are clear, "the intent of

21  the parties must be ascertained from the" 2007 MOU itself. *Id.* The 2007 MOU states that "[i]f a

22  project-related concern or issue is raised in a government-to-government consultation process with

23  an Indian tribe, …, and is related to NEPA or another federal environmental law for which

24  Caltrans has assumed responsibilities under this MOU, and either the Indian tribe or the FHWA

---

26  "we concluded that Caltrans and the [FHWA] were negotiating in good faith and tried to
    understand and respond to the tribal issues." (*Id.*)

27  [16]    "Federal law controls the interpretation of a contract entered pursuant to federal law when
28  the United States is a party." *Klamath Waters*, 204 F.3d at 1210.

determines that the issue or concern will not be satisfactorily resolved by Caltrans, then the

FHWA *shall* reassume all or part of the responsibilities for processing the project." (2007 MOU,

§ 3.2.3 (emphasis added).)[17]

The parties' dispute about the 2007 MOU focuses on the word "shall." Although the

parties dispute the meaning of that term, that "does not establish that the [2007 MOU] is

ambiguous; it is only ambiguous if reasonable people could find its terms susceptible to more than

one interpretation." *Klamath Waters*, 204 F.3d at 1210. Plaintiffs are correct that the term "shall"

often connotes mandatory language. *See, e.g.,* Black's Law Dictionary at 1585 (10th ed. 2014).

In some instances, however, the term "shall" can mean "may," *i.e.* it can be used in a permissive

sense. *See id.*; *see also N. Cal. Dist. Council of Laborers v. Pittsburg-Des Moines Steel Co.*, 69

F.3d 1034, 1037 (9th Cir. 1995) (finding that term "shall" as used in a forum selection clause was

permissive, rather than mandatory).

Section 3.2.3 states that when a tribe or the FHWA determines that Caltrans will not

satisfactorily resolve project related concerns raised during government-to-government

consultation, "the provisions of section 9.1 concerning FHWA initiated reassumptions shall

apply." Section 9.1.1, in turn, permits the FHWA to reassume responsibility for a project "upon

the FHWA's determination that … Caltrans cannot satisfactorily resolve an issue or concern raised

in a government-to-government consultation process[.]" Under Section 9.1.2, the FHWA is

required to "informally notify Caltrans" of that determination and provide "written notice" of the

determination and its reasons. Caltrans is provided with an opportunity to comment or object. In

order to make a final determination about whether it will reassume responsibilities for a given

project, the FHWA considers "Caltrans' comments or objections, the effect the reassumption will

have on the Pilot Program, amount of disruption of the project concerned, the effect on other

---

[17] The 2017 MOU provides that the Federal Defendants "may withdraw the assignment of all or part of the responsibilities for processing the project." (2017 MOU § 3.2.3.) Plaintiffs alleged that the Defendants failed to properly renew the MOU and ask that the Court declare the 2017 MOU unlawful and set it aside. (SAC ¶¶ 213-227, 235-237.) The Federal Defendants argue this claim is not viable, because their procedural argument focuses on the wrong Federal Register notice. Plaintiffs do not respond to the Federal Defendants' argument, and the Court concludes they have failed to meet their burden to show they are entitled to relief on that basis.

projects, confusion the reassumption may cause to the public, the potential burden to other Federal agencies, and the overall public interest." (2007 MOU § 9.1.2.)

"A written contract must be read as a whole and every part interpreted with reference to the whole, with preference given to reasonable interpretations." *Klamath Waters*, 204 F.3d at 1210; *see also Nat'l Res. Def. Council v. County of Los Angeles*, 725 F.3d 1194, 1206 (9th Cir. 2013) ("[A] court must give effect to every word or term" in an NPDES permit "and reject none as meaningless or surplusage.") (quotations and citation omitted). The Court must read Section 3.2.3 together with Section 9.1.2. When the Court considers the fact that, under Section 9.1.2, the FHWA must consider a number of factors, including Caltrans' responses and objections, before it makes a "final determination", the Court finds the term "shall" in Section 3.2.3 is permissive and gives the Federal Defendants the discretion to determine whether they will or will not reassume responsibilities for the Willits Bypass Project.

Accordingly, the Court denies Plaintiffs' motion for summary judgment and grants the Federal Defendants' cross-motion for summary judgment on the NHPA non-consultation claim, the NEPA claim, and the Federal Highway Statutes claim.[18]

## CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiffs' motion for summary judgment, and it GRANTS, IN PART, AND DENIES, IN PART, the Federal Defendants' cross-motion for summary judgment. The Court shall issue a separate judgment when it issues its Order on the Plaintiffs' and Caltriffs' Defendants cross-motions for summary judgment.

**IT IS SO ORDERED.**

Dated: March 30, 2018

_____
JEFFREY S. WHITE
United States District Judge

---

[18]     In light of this ruling, the Court does not reach the Federal Defendants' alternative argument that Plaintiffs are not third-party beneficiaries of the 2007 MOU.

21